# In the United States Court of Appeals
## for the Eleventh Circuit

UNITED STATES OF AMERICA,

*Plaintiff/Appellee*,

v.

FANE LOZMAN,

*Defendant/Appellant*.

OPENING BRIEF BY APPELLANT FANE LOZMAN

On Appeal from the United States District Court
for the Southern District of Florida

Fane Lozman
9 Island Ave.
Miami Beach, FL  33139
Telephone: 786-251-5868
fane@fanelozman.com

*United States of America v. Fane Lozman*

**Case No. 24-11477**

**CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT**

Pursuant to Fed.  R. App. P. 26.1 and Eleventh Circuit Rule 26.1-1, Defendant/Appellant submits this list, which includes the trial judge, and all attorneys, persons, associations of persons, firms, partnerships or corporations that have an interest in the outcome of this review:

1. Adkins, Brandon – Attorney at United States Dept. of Justice

2. City of Riviera Beach

3. Gray, Michael– Attorney at United States Department of Justice

4. Kim, Todd – Assistant Attorney General, United States Department of Justice

5. Lapointe, Markenzy– United States Attorney

6. Lee, Dexter – Assistant United States Attorney

7. Martinez, Rachel – Assistant United States Attorney

8. Matthewman, William – United Sates Magistrate Judge- Southern District of Florida

9. Middlebrooks, Donald M. – United States District Judge – Southern District of Florida

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-3, Appellant makes the following statement as to corporate ownership:

Appellant is an individual and does not have any parent corporation.

_____ /s/ *Fane Lozman* _____
Fane Lozman

Respectfully submitted,

By: */s/ Fane Lozman* _____
Fane Lozman

## STATEMENT REGARDING ORAL ARGUMENT

I will leave oral argument up to the discretion of the appellate panel. I have some interesting perspectives on State lands, floating homes, and First Amendment retaliation that the appellate panel may find noteworthy. This is based on my unique experience as the only individual in modern times to have won two cases at the U.S. Supreme Court with two different questions presented.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ............................................................ C-1

CORPORATE DISCLOSURE STATEMENT ............................................. C-2

STATEMENT REGARDING ORAL ARGUMENT .................................... i

TABLE OF CONTENTS ............................................................................ ii

TABLE OF AUTHORITIES ...................................................................... iii

JURISDICTIONAL STATEMENT…………………………………… 1

STATEMENT OF THE ISSUES…………………………………… 1,2

STATEMENT OF THE CASE .................................................................... 3

STATEMENT OF FACTS ........................................................................ 3-7

SUMMARY OF ARGUMENT .................................................................. 9

ARGUMENT ......................................................................................... 9-22

CONCLUSION…………………………………………………... 22,23

CERTIFICATE OF COMPLIANCE ......................................................... 23

CERTIFICATE OF SERVICE .................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Deltona Corp. v. Odom*, 341 So. 2d 977, 988 (Fla. 1976) (citing *State v. Gerbing*, 56 Fla. 603, 47 So. 353 (1908); *Martin v. Busch*, 93 Fla. 535, 112 So. 274 (1927)). ...........................................................................10

*Lewis v City of Union City*,
934 F.3d 1169, 1179 (11th Cir. 2019) ..................................................9

*Lozman v. City of Riviera Beach*,
569 U.S. 115 (2014).............................................................................6

*Lozman v. City of Riviera Beach*,
585 U.S. 87 (2018 ................................................................................6

*United States v. Estate of Boothy*,
16 F.3d 19,21(1st Cir 1994) ...............................................................13

**Statutes**

28 U.S.C. §1291 ......................................................................................1

Fla. Stat. §253.12 ....................................................................................5

Fla. Stat. §253.131(2)..............................................................................5

Rivers and Harbors Act...................................................................*passim*

Swamp and Overflow Grant Act of 1850, 43 U.S.C. Ch 23, §981 .................*passim*

**Other Authorities**

33 C.F.R. §320.4 ...................................................................................15

33 C.F.R. §5329.4 .................................................................................13

Fed. R. App. P. 27(d)(2)(A).................................................................23

Fed. R. App. P. 32(a)(5).......................................................................23

Fed. R. App. P. 32(a)(6).......................................................................23

Fed. R. App. P. 32(f) ..............................................................................23

Fed. R. Civ. P. 56(a) ...............................................................................9

September 2020 Judicial Conference of the United States, *Strategic Plan for the Federal Judiciary* ........................................................22

Jane Musgrave, *Coming off 2 U.S. Supreme Court cases, Fane Lozman takes on Riivera Beach, the State and the feds* Palm Beach Post, June 28, 2021 ........................................................7

## JURISDICTIONAL STATEMENT

The district court lacked jurisdiction in this case because the overflowed land that comprises Appellant Fane Lozman's property (hereinafter "overflowed") were never "navigable waters" under 33 C.F.R. §2.36(a). Dkt. 1 ¶2. The district court made a "clear error" by ignoring an Act of Congress (Swamp and Overflow Grant Act of 1850, 43 U.S.C. Ch 23, §981) and this error would cause "manifest injustice" if the appellate panel does not correct it. This Court has jurisdiction under 28 U.S.C. §1291. The district court entered judgment on March 6, 2024, Dkt. 117, and this appeal was timely noted on April 5, 2024.

## STATEMENT OF THE ISSUES

1.      Whether the district court erroneously determined, one hundred and seventy-four (174) years after the1850 Act of Congress (Swamp and Overflow Grant Act), which transferred bodies of "non-navigable waters" to the State of Florida, that somehow my non-navigable waters became navigable in 2024 without a subsequent Act of Congress stating so.

2.      Whether the district court erred in granting summary judgment against me on plaintiffs' claims that my 960 square-foot floating container home, the only floating home or vessel in a 6.1 million square feet (140 acres) area of private overflowed lands was an obstruction to the waters of the United States and mandated its removal.

3.      "[T]he government does not dispute that there had been no formal determination of navigability for (sic) Lake Worth Lagoon, and so deposing the division engineer would be entirely irrelevant." Dkt 104 (Order).  Based on this representation, did the district court judge err when he made a determination of navigability based on his own personal observations --especially in light of the fact that 33 C.F.R. Part 129.12b required a division engineer report to determine navigability?

4.      Whether the district court erroneously ruled that, because there was tidal action in the Lake Worth Lagoon, my overflowed lands, which are regularly mudfats and east of my State bulkhead line, turned into navigable waters.

5.      Whether the district court erroneously determined that the Southern District can deny *pro se* electronic filing even though the U.S. Court of Appeals for the Eleventh Circuit allows it.

# STATEMENT OF THE CASE

## I. COURSE OF PROCEEDINGS

### A. Overview.

This appeal is taken from two district court orders: namely, (i) the March 6, 2024, summary judgment for the plaintiff, which required me to remove my floating home from my private property, and (ii) the November 20, 2023, order denying my motion to file electronically as a *pro se* litigant.

### B. Plaintiff's Claims

On June 25, 2021, the United States filed a complaint that I built structures in the waters of the United States without authorization, in violation of the Rivers and Harbors Act.

## II. STATEMENT OF THE FACTS

### A. My property at 5101 North Ocean Drive on Singer Island, located in Riviera Beach, Florida is overflowed land designated by Congress as non-navigable.

In 1850, the United States Congress approved the Swamp and Overflowed Lands Act, 43 U.S.C. Ch. 23, §981.[1] This Act transferred 20 million acres of swamp and overflowed lands to the State of Florida.[2] The federal government deemed these

---

[1] Act approved September 28, 1850, referred to in text, is act Sept. 28, 1850, ch. 84, 9 Stat. 519 which is not classified to the Code.

[2] "Swamp and overflowed lands were acquired in 1850, by Act of Congress, where 20 million acres of swamp and oveflowed lands were granted to the state. The

lands "not to be navigable waters." 33 C.F.R. §2.36 (Navigable waters of the United States, navigable waters, and territorial waters) states in paragraph (a) that Congress has the power to designate specific waters of the United States "not to be navigable waters of the United States.

The following screenshot of 33 C.F.R. §2.36 was taken directly from the Code of Federal Regulations www.ecft.gov website.

Subchapter A / Part 2 / Subpart B / § 2.36          Previous / Next / Top

**§ 2.36 Navigable waters of the United States, navigable waters, and territorial waters.**

(a) Except as provided in paragraph (b) of this section, *navigable waters of the United States, navigable waters,* and *territorial waters* mean, except where Congress has designated them not to be navigable waters of the United States:

(1) Territorial seas of the United States;

(2) Internal waters of the United States that are subject to tidal influence; and

(3) Internal waters of the United States not subject to tidal influence that:

(i) Are or have been used, or are or have been susceptible for use, by themselves or in connection with other waters, as highways for substantial interstate or foreign commerce, notwithstanding natural or man-made obstructions that require portage, or

(ii) A governmental or non-governmental body, having expertise in waterway improvement, determines to be capable of improvement at a reasonable cost (a favorable balance between cost and need) to provide, by themselves or in connection with other waters, as highways for substantial interstate or foreign commerce.

https://www.ecfr.gov/current/title-33/chapter-I/subchapter-A/part-2/subpart-B/section-2.36

---

Florida Senate, Committee on Natural Resources, Interim Project Report 2002-143, pg. 2

In 1845, the U.S. government granted Florida 500,000 acres when it became a state. "Combined with the land received due to the Swamp and Overflowed Lands Act of 1850, the Trustees had more than 21 million acres under its control."[3]

"To manage this massive addition to Florida's Internal Improvement Lands, in 1851 the Legislature created the Board of Internal Improvement to administer all swamp and overflowed lands. In 1855, the Trustees of the Internal Improvement Trust Fund, now known as the Board of Trustees of the Internal Improvement Trust Fund of the State of Florida, was created to work with the Public Lands Office to administer the internal improvement lands as well as the swamp and overflow lands and the resulting monies generated from the sales." [4]

The "title to all islands, sandbars, shallow banks or small islands" in the tidal waters of Florida are vested "in the Trustees of the Internal Improvement Fund of the State of Florida." Acts 1917, Ch. 7304, Sec. 1 (codified at Fla. Stat. §253.12). Section 253.131(2) of Florida Statutes states that navigable waters "shall <u>not</u> extend to any permanent waters ….in the form of…. <u>overflowed lands</u> ….lying upon areas which have heretofore been conveyed to private individuals by the United States or by the state **without reservation of public rights in and to said**

<hr>

[3] History of State Lands, Florida Department of Environmental Protection, https://floridadep.gov/lands/lands-director/content/history-state-lands

[4] Florida Department of Environmental Protection—Division of State Lands, https://storymaps.arcgis.com/stories/da1cd7fadb9e4863bfa7124350800466

**water**." *Id*. 253.131(2) (emphasis added).

My overflowed property at issue in this Rivers and Harbor Case, located at 5101 North Ocean Drive, Riviera Beach, FL, is an 8-acre portion of the 309 acres of land in the Lake Worth Lagoon, conveyed by the State to a private developer (Lake Worth Realty Company) via Trustees of the Internal Improvement Fund (TIIF) Deed 17,146 in 1924. TIIF Deed 17,146 expressly included the right to develop the overflowed land for residential use, including the right to bulkhead and fill the land. *See* Fla. Stat. §253.12. The 309 acres in the TIIF property were zoned for residential use, and in the ensuing decades since the 1924 sale, 159 acres were bulkheaded and filled, and 317 homes were built in the southern bulkheaded half of the TIIF Deed. This leaves 150 undeveloped acres remaining to be developed.

### B. My Floating Home

I acquired my 8-acre parcel of land at issue in this case in 2014. Dkt. 101, Exhibit #3, (Lozman Deposition) at ¶106. Its previous owner was a lady who told me she "admired" my well-publicized first ( of two) U.S. Supreme Court victories against Riviera Beach. Dkt 101, Exh. #1 (Prelim. Hearing) at ¶112 *Lozman v City of Riviera Beach*, 568 U.S. 115 (2013) and *Lozman v. City of Riviera Beach*, 585 U.S. 87 (2018).

I placed a floating container home that I have built by Legacy Brothers, a Florida licensed General Contractor, on my property.

My floating container home had two sliding impact doors, impact windows, a tiled bathroom with shower and toilet, a kitchen, a rooftop deck, and was wired for 120-volt electric just as a regular home is.



Jane Musgrave, *Coming off 2 U.S. Supreme Court cases, Fane Lozman takes on Riivera Beach, the State and the feds*, Palm Beach Post, June 28, 2021

To control the repeated vandalism of my floating home, I attempted to secure a permit to build a fence on my property which the City denied, as was my request for water and permanent electrical service. I had temporary electric on my property and then the City made me get rid of it in a Code Enforcement Action. Prelim. Hearing ¶131.

## SUMMARY OF ARGUMENT

The waters on my overflowed lands were deemed not to be navigable by an Act of Congress in 1850, and there has not been any subsequent Act of Congress to the contrary to changes this transfer from the State of Florida. Nor did Florida's "public trust" doctrine prohibit the State from validly conveying title to the marine portion of my property in the first place. Under Florida law, the public trust doctrine applies only to bodies of water navigable in 1845 (when Florida entered the union).

## ARGUMENT

This Court reviews *de novo* the district court's grant of summary judgment "viewing all evidence and drawing all reasonable factual inferences in favor of the nonmoving party." *Lewis v. City of Union City*, 934 F.3d 1169, 1179 (11th Cir. 2019). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## I. THE DISTRICT COURT OVERLOOKED THAT THE 1850 SWAMP AND OVERFLOWED LANDS, IS AN ACT OF CONGRESS.

The district court first concluded that most of my property was submerged beneath the "navigable waters of the United States" under the Rivers and Harbors Act, and that my floating home was an obstruction on the waters of the United States. Order at ¶10. The district court's ruling was wrong on multiple points.

i.  Properties acquired by Florida under the Swamp and Overflow Grant Act of 1850 do not include lands under navigable waters.

ii. Lands under navigable waters were already held by the State in trust due to sovereignty.

iii. A deed from the Trustees of the Internal Improvement Fund purporting to convey lands acquired under the 1850 Act cannot convey sovereignty lands.

iv. These principles have been consistently recognized and applied in Florida law.

> "It is also recognized that properties acquired by the State under the Swamp and Overflow Grant Act of 1850 do not cover or include lands under navigable waters as such were already held by the State in trust by virtue of sovereignty, ... and a deed from the Trustees of I.I. Fund

purporting to convey lands acquired under the 1850 Act of Congress would not convey sovereignty lands. [citation omitted]. These principles have been consistently recognized and applied and are not to be doubted." *Deltona Corp. v. Odom*, 341 So. 2d 977, 988 (Fla. 1976) (citing *State v. Gerbing*, 56 Fla. 603, 47 So. 353 (1908); *Martin v. Busch*, 93 Fla. 535, 112 So. 274 (1927)).

## II.   Lozman's property was dry land in 1879

A map from 1879, introduced in discovery, illustrates the non-navigability of the lake:



Dkt. 37 Exh. 10.  (Annotation in document as produced.)

As this map highlights, in 1879, my property, "at its current latitude of 26 degrees 48 minutes and longitude of 80 degrees 2 minutes," was on "dry land on the east side of Lake Worth."  It was not until the "late 1930s" when a trench was (illegally) dredged near my property ("to construct North Ocean Drive") that my dry land began

eroding into the trench.

A contemporary photograph of the property illustrates both the dredge channel and the utterly non-navigable mud flats that surround it:



Mudflats where my floating home is moored next to the illegal dredge channel on my property. Dkt. 37, Exh. 13. (Annotation in document as produced.)



Lozman's floating home on the mudflats, east of the dredge channel.
Dkt. 37, Exh. 8

It is impossible to use my overflowed lands for interstate or international commerce because even a canoe or kayak transiting through this area would run aground during low to slack tide in the ankle-deep water.

**III. My floating home is on my private property on which I pay taxes and had a homestead exemption.**

The district court's reference to permanently moored vessels in public waters has no relevance to this case. Dkt 109, Order ¶6. See *United State v. Estate of Boothy*, 16 F.3d 19,21 (1ˢᵗ Cir 1994). *Boothy* involved houseboats that were permanently moored in <u>public waters</u>. My floating home is on my private property.

**IV. The Army Corps has "unclean" hands in bringing this case**

The Army Corps investigator showed up within 48 hours of my bringing my floating container home to my private property. This started the ball rolling for the filing of the RHA case against me. It was a constant lobbying effort by the Riviera Beach City leadership, including the City Manager and one of the local officials, Councilperson Julie Botel, that coordinated an email bombardment of the Army Corps District Engineer in Jacksonville, Florida. Along with emails, there were constant phone calls to the Army Corps office in West Pam Beach, urging the Corps to take enforcement action against me. I previously filed a complaint against Ms. Botel with the State Ethics Board, and Governor DeSantis censured and reprimanded Botel based on my complaint. This RHA case was Ms. Botel's retaliatory payback.

2. Julia Botel is hereby publicly censured and reprimanded.

_Ron DeSantis_
GOVERNOR

DATE: January 28, 2021

By: _____
James Uthmeier
ACTING GENERAL COUNSEL
On behalf of and by the authority of Governor Ron DeSantis

ATTEST:

_Laurel M. Lee_
Laurel M. Lee
SECRETARY OF STATE

2021 JAN 28 PM 4: 26
DEPARTMENT OF STATE
TALLAHASSEE, FL
FILED

Dkt. 103, ¶8

I took the deposition of Colonel James Booth, the District Engineer for the Jacksonville District, which covers Florida, Puerto Rico, and the U.S. Virgin Islands. It is quite telling that Col. Booth was not concerned about the sunken barge in the following photos, which is close to a defense contractor and multiple commercial marinas in Riviera Beach. Nor did Col. Booth have any idea why my floating home was a problem, and he had no knowledge of what are harbor and bulkhead lines.

Interestingly there was only one other Rivers and Harbors case brought by the Army Corps in the last 2 ½ years.  In lieu of the panel reading the transcript, I am pasting below the relevant sections from Colonel Booth's deposition.

```
15          Q      Since you've been in command, how many
16     enforcement actions have you signed off on for
17     violations of the Rivers and Harbors Act?
18          A      A group somewhere between -- all for one
19     event -- somewhere between 10 and 20 folks that we
20     sent a notice to, notice of violation.
21          Q      So basically in two-plus years, you've
22     done one enforcement action on the Rivers and
23     Harbors Act?
24          A      That I recall, yes, sir.
```

Dkt 103, ¶5

9        Q    Is a sunken barge that's been abandoned

10   for five years that has no navigation lights and is

11   resting on the bottom, is that a violation of the

12   Rivers and Harbors Act?

13            MR. ADKINS:  Objection.

14       A    There's a lot of sunken vessels that are

15   throughout the waterways in Florida.  The Army Corps

16   of Engineers tends to not engage with those unless

17   they are actually in the navigable channel.

18   BY MR. LOZMAN:

19       Q    The navigable channel, Colonel, is about a

20   hundred feet away from where the sunken barge is,

21   800 feet from the Lockheed Martin defense

22   contracting submersible facility.

23            So would that come under your purview that

24   that's a violation of the Rivers and Harbors Act to

25   leave a hundred some-odd-foot barge resting on the

Dkt. 103, ¶6

16

```
 5         A    We do not, as a matter of course, engage
 6    in derelict barge or derelict vessels that are not
 7    in navigable channels or navigation channels.
 8    BY MR. LOZMAN:
 9         Q    Okay.  My floating home is eight-tenths of
10    a mile from the Intracoastal Waterway.  Why did your
11    regulator come to my private beach to start a Rivers
12    and Harbors Act on something that's eight-tenths of
13    a mile away, yet you have a giant sunken barge that
14    no enforcement action has taken place?
15         A    I don't know, sir.
```

Dkt 103, ¶7

The following photos prove how legally flawed and retaliatory this Rivers and Harbors case has been.  An unlit barge, sunk since 2016, was the ultimate hazard to navigation with dozens of concrete docks tied to it.  Floating homes and hundreds of vessels near Peanut Island, located west of the Palm Beach Inlet, were moored over sovereign submerged State lands.  Yet, the Army Corps could focus its only enforcement action in Palm Beach County against me and my container home on my private Singer Island property.

17



Dkt 37, Exhibit 2    Sunken barge with concrete floats attached to it.
(Annotations in document as produced.)



Dkt 37, Exh. 4    Sunken barge with concrete floats attached to it.



Dkt. 37, Exh. 6   Sunken barge, photo taken from the Northeast looking to the Southwest.  (Annotation in document as produced.)



Dkt. 37, Exh. 7   Photo taken from the North facing South.  (Annotation in document as produced.)

The sunken barge, depicted above, was only: i.) three hundred feet west of the Intracoastal waterway; ii.)  eight hundred twenty feet northeast of the Lockheed Martin Defense Contractors submersible research facility; iii.)  four hundred fifty feet east of Rybovich, one of the country's largest megayacht shipyards; and iv.) two hundred eighty feet southeast of New Port Cove marina with wet and dry slips for three hundred and forty-three vessels.



Dkt. 37, Exh. 3  Sunken barge with concrete floats is slighty left of the middle of the aerial photo.  (Annotation in document as produced.)  The small white specks are floating homes and vessels anchored on State soverign submerged lands.

These concrete floats tied to the sunken barge broke loose in 2018.  These floats were retrieved and continued to spend the next four years moored to the sunken barge without any type of enforcement action from the D.O.J. or the Army Corps of Engineers.

Additional photograph evidence (Dkt. 37) shows hundreds of vessels and dozens of floating homes moored adjacent to Riviera Beach, West Palm Beach, Singer Island, and Palm Beach Island, on **public property**!  Again, the Plaintiff has not taken any enforcement action against a single one.  This type of selective enforcement should have placed the government at a disadvantage when seeking equitable relief from the district court.  The Plaintiff's selective enforcement should

not be rewarded.

## IV. Pro Se parties should be allowed electronic filing in the Southern District of Florida.

The district court entered an order (Dkt. 86) denying electronic filing for *pro se* parties. This order is violative of the Eleventh Circuit's rule for *pro se* electronic filing. The Southern District of Florida ("SDFL") prohibition on *pro se* filing violates due process and causes the needless time and expense for *pro se* litigants to go to the clerk's office to file their case documents.

The SDFL local rule is also contrary to the *Strategic Plan for the Federal Judiciary,* September 2020 Judicial Conference of the United States[5], which holds as a core value, *Equal Justice*, the "fairness and impartiality in the administration of justice; accessibility of court processes; and treatment of all with dignity and respect." Another core value *Accountability* ("efficient use of resources") is ignored because local rules that deny *pro se* electronic filing, results in the waste of clerk's staff time to hand scan each *pro se* filing.

---

[5]

https://www.uscourts.gov/sites/default/files/federaljudiciary_strategicplan2020.pdf

## CONCLUSION

The district court's judgment should be reversed, and this case remanded with the directive to dismiss the Plaintiff's case with prejudice. And a letter sent to the Clerk of the SDFL to immediately implement electronic filing for *pro se* parties.


July 31, 2024                               Respectfully submitted,


                                        By: */s/ Fane Lozman*_____
                                              Fane Lozman

                                        9 Island Ave, Miamii Beach, FL 33139
                                        Telephone: 786-251-5868
                                        fane@fanelozman.com

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limit of Fed. R. App. P. 27(d)(2)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 2799 words.

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman style font.


                                        By: */s/ Fane Lozman*_____
                                              Fane Lozman

**CERTIFICATE OF SERVICE**

I certify that on July 31, 2024, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF and that the foregoing document is being served

this day on all counsel of record via transmission of Notices of Electronic Filing

generated by CM/ECF.

By: */s/ Fane Lozman* _____
Fane Lozman